UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AMANDA DUREN, | ) | CIVIL ACTION |
| | ) | FILE NO. |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FLSA ACTION |
| | ) | |
| | ) | |
| INTERNATIONAL FOLLIES, INC. | ) | |
| d/b/a Cheetah and JACK BRAGLIA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW**, AMANDA DUREN a/k/a "Alex" and files this

Complaint against INTERNATIONAL FOLLIES, INC. d/b/a Cheetah and

JACK BRAGLIA and show:

## INTRODUCTION

1.     Plaintiff is a former employee of INTERNATIONAL FOLLIES,

INC. ("Cheetah").

2.     Cheetah operates an adult entertainment club in Atlanta, Fulton

County, Georgia known as the "Cheetah."

3.     JACK BRAGLIA ("Braglia") is the general manager of Cheetah

and owner of Cheetah. At all times relevant to Plaintiff's Complaint, Braglia exercise operational control over Cheetah.

4.      Cheetah failed to pay Plaintiff the minimum wage and overtime wage for all hours worked in violation of 29 U.S.C. §§ 206 and 207 of the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq*. ("FLSA").

5.      Cheetah also required Plaintiff to make certain payments to Cheetah employees and others which caused Plaintiff's wages to drop below the minimum wage and applicable overtime wage, thereby constituting an illegal deduction under the FLSA.

6.      Cheetah required Plaintiff to contribute to an unlawful tip pool which caused Plaintiff's wages to drop below the minimum wage and applicable overtime wage.

7.      As a result of Defendants' violation of the FLSA, Plaintiff seeks all unpaid minimum and overtime wages, recovery of unlawful deductions, liquidated damages, interest, and attorneys' fees and costs pursuant to 29 U.S.C. § 216.

## **JURISDICTION AND VENUE**

8.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because this action arises under the FLSA, 29 U.S.C.

§ 201 *et seq.*

9.    Venue is proper in this District because all or a substantial portion of the events forming the basis of this action occurred in this District. Defendants' club is located in this District and Plaintiff worked in this District.

**PARTIES**

10.    Plaintiff was employed as an entertainer by Cheetah and she qualified as an "employee" as defined by the FLSA, 29 U.S.C. § 203(e)(1).

11.    Plaintiff has consented in writing to assert claims under the FLSA.

12.    Plaintiff is a former entertainer who was employed by Defendants as an entertainer from August of 2015 to on or about August 19, 2018.

13.    International Follies, Inc. d/b/a The Cheetah is a Georgia Corporation with its principal place of business located at 887 Spring Street, NW, Atlanta, Fulton County, Georgia 30308. At all times mentioned herein, Cheetah was an "employer" of Plaintiff within the meaning of the FLSA, 29 U.S.C. § 203(d), (g). Defendant International Follies, Inc. d/b/a Cheetah may be served by serving its registered agent, William M. Hagood at 887 Spring Street NW, Atlanta, Fulton County, Georgia, 30308.

14.     Defendant Jack Braglia ("Braglia") is the General Manager of the Cheetah and a resident of Fulton County, Georgia. Braglia acted directly or indirectly on behalf of Cheetah, and, at all times mentioned herein was an "employer" or joint employer of Plaintiff within the meaning of the FLSA. Defendant Braglia may be served at 887 Spring Street, NW, Atlanta, Fulton County, Georgia 30308, or anywhere he may be found.

## FACTUAL ALLEGATIONS

15.     Plaintiff was employed by Cheetah as an entertainer between August of 2015 to on or about August 19, 2018.

16.     The primary duty of a cheetah entertainer is "to dance and entertain customers, give them a good experience."

17.     Specifically, an entertainer performs stage and table dances, and entertains customers on an hourly basis.

18.     Stated differently, entertainers "danc[e] on stage, perfor[m] table dances, and entertai[n] customers in Cheetah's VIP rooms, all while nude or semi-nude."

### A.   <u>FLSA Claims Arising Prior to April 9, 2016</u>.

19.   From 2001 until April 9, 2016, Cheetah classified entertainers as independent contractors.[1]

20.   Plaintiff worked for Cheetah prior to April 9, 2016 and was misclassified as an independent contractor.

21.   Cheetah exercised significant control over Misclassified Plaintiff through written and unwritten policies and procedures.

22.   Misclassified Plaintiff was subject to specific work schedules requiring her to be at work at certain times and on certain days.

23.   Misclassified Plaintiff was required to work at least 3 scheduled shifts per week.

24.   The weekly schedule was determined at the onset of Misclassified Plaintiff employment and changed only with Cheetah's consent.

25.   For each night shift, Misclassified Plaintiff was required to be at work by 7:30 pm., on the floor at 8:00 p.m. and remain at work until checkout was completed which rarely occurred before 3:30 am.

---

[1]   From Cheetah's inception through the present, it has repeatedly changed the employment status of its entertainers to reflect its business interests. In the 90's, Cheetah treated entertainers as employees. In 2001, it began treating them as independent contractors. In 2016, Cheetah began treating entertainers as employees again.

26.     Requests for a night off or a vacation while scheduled to work were required to be approved by Cheetah and/or Braglia in advance.

27.     If misclassified Plaintiff showed up late for work were fined between $25 and $50 depending on the time she arrived at work.

28.     If an entertainer arrived after 9:45, she was not permitted to work, and subject to other discipline.

29.     An entertainer was subject to discipline, including suspension or termination, for an unexcused absence from work.

30.     Misclassified Plaintiff was required to dance at specified times and in a specified manner on stage and for customers.

31.     Misclassified Plaintiff was required to perform stage dance sets once every hour during each shift.[2]

32.     Each stage set consisted of four (4) dances.

---

[2] When an entertainer arrived for work, she was required to sign in with the house mom. The house mom typically then assigns the entertainer to one of four color-coded dance groups (red, yellow, green, blue). These assignments determine when each entertainer actually performs on stage.

33.     Misclassified Plaintiff was also required to participate in a walk out and provide two for one dances every night following the walkout ceremony.

34.     During the walkout all of the entertainers are required to dress in evening gowns and parade before the customers.

35.     Cheetah tightly controlled the nightly walkout. Specifically, Cheetah's rules regarding the walkout demonstrate its control:

> [w]alkout for nightshift is at 10:00 p.m.  A two-for-one dance (two songs for $10) immediately follows the walkout. When you hear the house mom calling for everyone to go behind the main stage and line up, you should be ready and headed that way. Once behind the main stage, line up on either side and follow the line as it move up to the top of the stage. The house mom will be there and she will tell which stage to stop-on. Once the DJ calls your name make your way down the main stage and to the stage number that you were assigned. Once at your stage, smile and wait to be picked. DO NOT TALK TO EACH OTHER WHILE YOU ARE ON STAGE.  If you are picked, make sure everyone has walked out, use the stairs to get off the stage, and go to the customer's table. Dance two songs for $10. (Remember that all reviews are danced table-top, stage-top, and bar-top only, on the main floor.) If you are not picked, you must stay on stage for the entire two-for one and wait for the next set to show up before you get down.

36.     Cheetah exercised significant control over other key aspects of an entertainer's work, such as "Table Dancing."

37.     With regard to table dancing, Cheetah's rules provide as follows:

·        [t]able dances are done table-top, table-side, stage top, stage-side, bar-side or bar-top in the main room. You **must** dance tableside in VIP rooms, in the dining room, in the mezzanine area. In the executive room, you may dance either table-top or table side;

(emphasis added).

38.    Cheetah controlled the amount an entertainer could charge a

customer for a table dance:

·        [a]ll table dances are $10.  ***You may <u>not</u> ask for more than $10 for a dance anywhere in the club.***

(emphasis added).

39.    Cheetah controlled the way an entertainer could interact with a

customer:

·        [e]ntertainers are allowed to ask for dances, but the are **<u>NOT</u>** allowed to go from person to person asking for them. We observe a no-hassle policy with dances here. You <u>may</u> mingle and flirt with customers to let them know that you are available to dance for them. We encourage you to act has hostesses, ask customers' name, introduce yourself, etc....

40.    Cheetah controlled the way an entertainer danced for a customer:

·        [d]ancing at the Cheetah is *very* conservative compared to other clubs. We want dancing here to be very clean, so we do not allow lewd dancing... Here are some dancing "don'ts" and "nevers":

-No squatting
-No slapping
-No "pulling" (of butt cheeks-gross!)
-No fondling (by your or by the customer)
-No "flossing" or "slingshotting" your bottoms
-No bending over
-Never give your bottoms to a customer
-Never take a tip from behind
-Never get down from a table until you are full dressed

Please remember that you should only be naked while dancing. ***You are not allowed to walk around topless or naked.***

41.     Defendants controlled the means and manner by which Misclassified Plaintiff performed their duties at the workplace.

42.     Defendants had authority to suspend, fine, fire, or otherwise discipline entertainers for non-compliance with its rules regarding dancing.

43.     Defendants actually suspended, fined, fired, or otherwise disciplined entertainers for non-compliance with its rules regarding dancing.

44.     Defendants tightly regulated entertainer appearance while on duty, including the costumes, footwear, makeup, hair, nails and accessories used by an entertainer.

45.    Each entertainer was "required to wear makeup, to have [their] nails painted, and to have [their] hair done, all according to standards communicated to [them] by Cheetah management and/or house moms."

46.    If an entertainer failed to comply with the dress and appearance requirements, she was required to either correct the problem, or was not allowed to perform.

47.    Entertainer footwear was specifically subject to management approval.

48.    Each entertainer was required to wear stiletto heals no shorter than 4.5 inches.

49.    Each entertainer was forced to wear two-piece outfits and garters for stage dancing, covers for walking around and break away bottoms.

50.    Although Defendants allowed entertainers to choose their own costumes, Defendants reserved the right to decide what a particular entertainer was allowed to wear on the premises.

51.    In short, Defendants directly and meticulously controlled entertainer appearance while on duty at the club.

52.    Defendants provided and paid for all advertising and marketing efforts undertaken on behalf of Cheetah.

53.     Defendants paid for the building used by the Cheetah, maintenance of the facility, the sound system, stages, lights, food, beverage and inventory used at the facility.

54.     Defendants made all hiring decisions regarding wait staff, security, entertainer, managerial and all other employees on the Cheetah premises.

55.     Defendants opportunity for profit and loss far exceeded each entertainer's opportunity for profit and loss from work at the Cheetah.

56.     Nude dancing is an integral part of Cheetah's operations. Cheetah's advertising prominently displays nude dancing for its customers. The Cheetah is well known as a "strip club."

57.     Cheetah needs entertainers to successfully and profitably operate the Cheetah business model.

58.     The position of entertainer requires no managerial skill of others.

59.     The position of entertainer requires little other skill or education, formal or otherwise.

60.     The only requirements to become a Cheetah entertainer are "physical attributes" and the ability to dance seductively.

61.     The amount of skill required is more akin to an employment

position than that of a typical independent contractor.

62.     The hiring process involves a brief audition before Defendant Braglia or one of Cheetah's house moms.

63.     The audition consists of the prospective entertainer briefly dancing in the nude for Defendant Braglia or the house mom, or merely disrobing and showing the house mom or Defendant Braglia her nude front and backside.

64.     Defendants do not require prior experience as an entertainer or any formal dance training as a job condition or prerequisite to employment.

65.     Defendants do not require the submission of an application or a resume as part of the hiring process.

66.     Misclassified Plaintiff had little or no formal dance training and experience before auditioning to dance at Cheetah.

67.     Defendants failed to pay Misclassified Plaintiff an hourly wage or salary.

68.     Instead, Misclassified Plaintiff was compensated by Defendants' customers in the form of tips and gratuities.

69.     The tips and gratuities were paid directly by the customer to the Misclassified Plaintiff.

70.    Defendants never took possession of the payments made to Misclassified Plaintiff.

71.    Defendants never distributed tips to Misclassified Plaintiff.

72.    Defendants failed to keep records of Misclassified Plaintiff's tips, gratuities and/or service charges paid to Plaintiff or any other entertainer by customers in violation of 29 CFR Part 516.28.

73.    Defendants failed to include Misclassified Plaintiff's earnings from customers in Cheetah's gross receipts for tax or accounting purposes.

74.    At the end of each shift, each Misclassified Plaintiff was required to go through a tip out procedure during which the entertainer was required to pay the House mom, floormen, floor manager, disc jockey, "Cheetah buck" girls, and other Cheetah employees a portion of their tips.

75.    Misclassified Plaintiff, if late for work, failed to appear for a scheduled shift, or are deemed to have violated certain Cheetah rules, were charged additional fees or fines that were retained by the Club or management.

76.    Fines are paid directly to the General Manager and/or house mom.

77.    Defendants maintain no record of fines, tips and gratuities and/or service charges received by Misclassified Plaintiff.

78.     Defendants maintain incomplete records of time worked by Misclassified Plaintiff.

79.     Defendants' failure to maintain records of the time worked and amounts paid as fines, tips, gratuities and service charges violate the record keeping requirements of 29 CFR Part 516.

80.     Defendants required Plaintiff to attend meetings at Defendants' business.

81.     Misclassified Plaintiff typically worked at least three (3) eight (8) hour shifts per week without being paid any wages by Defendants.

82.     Misclassified Plaintiff worked over forty (40) hours in some weeks they worked for Defendants without being paid any wages.

83.     In order to comply with Defendants' strict dress and appearance standards, Misclassified Plaintiff typically expended at least one (1) hour of time each shift getting ready for work without being paid any wages for such time getting ready.

84.     At the end of each night shift, Misclassified Plaintiff was required to wait at Cheetah until the premises and the parking lot were cleared of customers before being allowed to leave work without being paid wages for such waiting time.

85.     Defendants never paid Misclassified Plaintiff any wages or compensation for any hour in any workweek in which they worked, got ready for work or were required to be on the premises.

86.     Defendants did not pay Misclassified Plaintiff one-and-a-half times their regular rate of pay when Plaintiff worked over forty hours in a given workweek.

87.     Defendants have repeatedly been sued for similar non-compliance with the FLSA beginning in 2013.

88.     Defendants have been subject to numerous arbitration proceedings raising similar FLSA issues resulting in several adverse FLSA decisions involving the same issues in this lawsuit.

89.     Cheetah have repeatedly sought and received counsel from attorneys regarding the legality of their FLSA misclassification schemes.

90.     Since at least 2011, Defendants have been aware that similar FLSA misclassification schemes involving similar adult entertainment establishments are illegal.

91.     In spite of Defendants' knowledge of the illegality of its FLSA misclassification schemes and compensation practices, it continued until April

8, 2016, to operate illegally because the practice was financially profitable to Cheetah, and its owner, manager and staff.

92. Defendants knew, or showed reckless disregard for the fact that they misclassified these individuals as independent contractors, and accordingly failed to pay these individuals the minimum and overtime wage at the required rate under the FLSA and unlawfully deducted tip-outs and fines from their pay.

93. Misclassified Plaintiff was not covered by any minimum or overtime wage exemption contained in the FLSA.

### B.   Claims Accruing After April 9, 2016.

94. On or about April 9, 2016, Cheetah began classifying its entertainers as employees under the FLSA.

95. After reclassification, Defendants began paying entertainers a wage of $2.13 per hour for each hour "on the clock" and used a tip credit to make up the difference between the hourly wage and the minimum wage under the tip credit provisions of the FLSA.

96. The primary duties of an entertainer after reclassification remained the same as before reclassification.

97. Plaintiff was required to work at least three (3) shifts per week.

98.    Plaintiff worked a day or night shift.

99.    Plaintiff was required for each night shift to be at work by 7:30 pm., on the floor at 8:00 p.m. and remain at work until checkout was completed which rarely occurred before 3:30 am.

100.    During the day shift, entertainers were required to be at work by 11:00 a.m., on the floor by 11:30 a.m. and remain at work until 8:00 p.m., and checkout was completed by roughly 8:30 p.m.

101.    After reclassification, Defendants continued to tightly regulate entertainer appearance while on duty, including the costumes, footwear, makeup, hair, nails and accessories used by an entertainer to work at Cheetah.

102.    After reclassification, each entertainer was still "required to wear makeup, to have [their] nails painted, and to have [their] hair done, all according to standards communicated to [them] by Cheetah management and/or house moms."

103.    Because of Defendants' strict dress and appearance requirements, Plaintiff typically required in excess of an hour per shift of time to get ready for work.

104.    Defendants did not pay the entertainers for the time they spent getting ready for work required to comply with Defendants' policies.

105.   Defendants knew that their entertainers were not being compensated for time incurred getting ready for work at Cheetah.

106.   After reclassification, Defendants continued to require Cheetah dancers to go through a check-out process at the end of each shift, during which the entertainer is required to make certain payments to the floor men, floor manager, house moms and DJ.

107.   The checkout process included a breathalyzer test and required the entertainer to wait for the floor to clear, to wait in line to make the required payments, wait for the parking lot to clear before they could leave the premises.

108.   Defendants did not pay the entertainers for the time they spent getting ready for work and going through the mandatory check out and required waiting procedures.

109.   Defendants knew that entertainers were not being compensated for the time incurred waiting on the premises to leave work.

110.   After reclassification, Defendants continued to require entertainers to find and pay for another dancer to "cover" for her if she did not receive permission to miss work or could not make it to work on a scheduled shift.

111.   The cover charge minimum was $40 per shift and the average night shift charge for a cover was $80 per shift.

112.   Every time an entertainer was required to pay a cover in a workweek, her wages dropped below the minimum wage for that workweek, and the overtime wage in those workweeks in which overtime wages were applicable.

113.   Plaintiff paid covers which dropped their wages to drop below the minimum wage and applicable overtime rate.

114.   Defendants knew that its entertainers were paying covers when they were unable to work.

115.   After Defendants classified entertainers as employees, they required each entertainer to contribute ten percent (10%) of their earnings to a tip pool.

116.   The tip pool was improperly divided amongst the house moms, floor men, night manager and disc jockey each shift.

117.   Upon information and belief, the disc jockey then "kicked" back a portion of the "tip" to Defendants.

118.   Because a portion of the tip pool was shared with management, floor men, house moms and the DJ, the tip pool is invalid under the FLSA.

119.   Because the tip pool is invalid, Defendants are not entitled to a tip credit for the difference between the hourly wage of $2.13 and the minimum wage of $7.25 per hour.

120.   Because Cheetah did not pay Plaintiff $2.13 an hour, Cheetah is not entitled to a tip credit.

121.   After reclassification, entertainers were still required to pay the floormen a tip of 20% for all VIP referrals.

122.   Plaintiff paid floormen VIP referral fees to floormen during certain workweeks.

123.   For each workweek in which a VIP referral fee was paid by an entertainer, the entertainer's wages dropped below the minimum wage.

124.   The cover charges, VIP referral fees, unpaid time spent getting ready for work, going through the check-out process, time spent waiting after work and invalid tip pool caused Plaintiff's wages to drop below the minimum wage.

125.   Cheetah's entertainers were not covered by any exemption under the FLSA.

126.   Defendants maintained inaccurate records of fines, tips and gratuities and/or service charges received by Plaintiff.

127.   Defendants maintain incomplete records of time worked by Plaintiff.

128.   Defendants failure to maintain records of the time worked and amounts paid as fines, tips, gratuities and service charges violate the record keeping requirements of 29 CFR Part 516.

129.   Defendants knew, or showed reckless disregard for the fact that there compensation policies violated the FLSA.

### COUNT I
### MINIMUM WAGE CLAIM (Claims for Violation of 29 U.S.C. § 206)

130.   Each Defendant is an "employer" or joint employer of Plaintiff a within the meaning of the FLSA, 29 U.S.C. § 203(d).

131.   Defendants are engaged in "commerce" and/or in the production of "goods" for "commerce" as those terms are defined in the FLSA.

132.   Defendants operate an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), because it has employees engaged in commerce, and because its annual gross volume of sales made is more than $500,000.

133.   Plaintiff consents to sue in this action pursuant to 29 U.S.C. § 216(b).

134.   A consent to sue executed by Plaintiff is attached hereto.

135.    Defendants failed to pay Plaintiff the minimum wage in violation of 29 U.S.C. § 206.

136.    Based upon the conduct alleged herein, Defendants knowingly, intentionally and willfully violated the FLSA by not paying Plaintiff the minimum wage under the FLSA.

137.    Throughout the relevant period of this lawsuit, there is no evidence that Defendants' conduct that gave rise to this action was in good faith and based on reasonable grounds. In fact, Defendants continued to violate the FLSA long after it learned that its misclassification scheme and compensation policies were illegal.

138.    Due to Defendants' FLSA violations, Plaintiff is entitled to recover from Defendants, minimum wage compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including interest, pursuant to 29 U.S.C. § 216(b).

## COUNT II
## OVERTIME WAGE CLAIM (Violation of 29 U.S.C. § 207)

139.    Each Defendant is an "employer" or joint employer of Plaintiff within the meaning of the FLSA, 29 U.S.C. § 203(d).

140.    Defendants are engaged in "commerce" and/or in the production

of "goods" for "commerce" as those terms are defined in the FLSA.

141.   Defendants operate an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), because it has employees engaged in commerce, and because its annual gross volume of sales made is more than $500,000.

142.   Plaintiff consents to sue in this action pursuant to 29 U.S.C. § 216(b).

143.   A consent to sue executed by Plaintiff is attached to this Complaint.

144.   Defendants failed to pay Plaintiff overtime wage for each hour in excess of forty (40) during each workweek in which they worked in violation of 29 U.S.C. § 207.

145.   Based upon the conduct alleged herein, Defendants knowingly, intentionally and willfully violated the FLSA by not paying Plaintiff the overtime wage required under the FLSA.

146.   Throughout the relevant period of this lawsuit, there is no evidence that Defendants' conduct that gave rise to this action was in good faith and based on reasonable grounds. In fact, Defendants continued to violate the FLSA long after it learned that its misclassification scheme and

compensation policies were illegal.

147.   Due to Defendants' FLSA violations, Plaintiff is entitled to recover from Defendants, overtime wage compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including interest, pursuant to 29 U.S.C. § 216(b).

## COUNT III
## UNLAWFUL TAKING OF TIPS (Violation of 29 U.S.C. § 203)

148.   Plaintiff repeats and realleges the allegations in the preceding paragraphs of this Complaint, and incorporate the same herein by this specific reference.

149.   Each Defendant is an "employer" or joint employer of Plaintiff within the meaning of the FLSA, 29 U.S.C. § 203(d).

150.   Defendants are engaged in "commerce" and/or in the production of "goods" for "commerce" as those terms are defined in the FLSA.

151.   Defendants operate an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), because it has employees engaged in commerce, and because its annual gross volume of sales made is more than $500,000.

152.   Under TIPA:

[a]n employer may not keep tips received by its employees

for any purpose including allowing managers or supervisors
to keep any portion of employees' tips, regardless of whether
or not it takes a tip credit.

29 U.S.C. § 203.

153.   Defendants kept a portion of tips paid to Plaintiff by Defendants' customers in the form of fees, and/or mandatory charges and other payments to management, house moms, DJ and floormen in violation of TIPA.

154.   As a result of Defendants willful violation of TIPA, Plaintiff is entitled to recover, under the FLSA and TIPA, all tips kept by the employer, any tip credit claimed by Defendants, an equal amount in liquidated damages and attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Court grant relief as follows:

a.   As to Count I award Plaintiff judgment for wages at the minimum rate, including the recovery of all payments reducing wages below the minimum wage, as well as liquidated damages, interest and attorneys' fees as provided for under the FLSA;

b.   As to Count II award Plaintiff judgment for overtime wages, including the recovery of all payments reducing wages below the

overtime wage, as well as liquidated damages in an equal amount, interest and attorneys' fees as provided for under the FLSA;

c.    As to Count III award Plaintiff judgment for the recovery of all tips kept by the employer, the amount of any tip credit claimed by Defendants, an equal amount in liquidated damages and reasonable attorneys' fees under the FLSA and TIPA;

d.    Award Plaintiff costs of this action, including expert fees;

e.    Grant Plaintiff a jury trial on all issues so triable; and

f.    Award Plaintiff such other and further relief as the Court may deem just and proper.

*[Signature page to follow]*

This 4th day of April, 2019.

**FLYNN LAW FIRM, LLC**


/s/ Jonah A. Flynn
Jonah A. Flynn
Georgia Bar No. 266555
*Counsel for Plaintiff*

4200 Northside Parkway NE
Building One, Suite 200
Atlanta, GA 30327
Phone: 404-835-9660
Fax: 404-835-6005
e-mail: jflynn@flynnfirm.com


DUDLEY LAW, LLC


*/s/ Ainsworth G. Dudley*
Ainsworth G. Dudley
Ga. Bar No. 231745
Attorney for Plaintiff
adudleylaw@gmail.com

4200 Northside Parkway
Bldg. 1, Suite 200
Atlanta, GA  30327
404.687.8205

## **JURY DEMAND**

Pursuant to F.R.C.P 38, Demand is hereby made for trial by jury of 12 on all issues raised by these pleadings.

/s/ Jonah A. Flynn

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing pleading complies

with the font and point selections approved by the Court in Local Rule 5.1B.

This pleading has been prepared in Times New Roman font, 14 point.


/s/ Jonah A. Flynn